COPY

AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>MICHAEL POTERE | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>**17-1555M** |
|---|---|

Complaint for violation of Title 18, United States Code, Section 1951(a)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE ALEXANDER F. MACKINNON | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>On or about May 16, 2017 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) | FILED<br>CLERK, U.S. DISTRICT COURT<br>JUN 20 2017<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY_____DEPUTY |
|---|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 1951(a)]

Beginning on or about May 16, 2017, and continuing to on or about June 17, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendant MICHAEL POTERE ("POTERE"), knowingly and with the intent to obtain property, obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, in that defendant POTERE knowingly attempted to obtain property consisting of at least $200,000 from victim ILF, with victim ILF's consent, induced by the wrongful use of fear, by threatening to cause economic harm by distributing confidential and sensitive ILF documents to "Above The Law," if victim ILF refused to transfer money, a piece of artwork, and other items to defendant POTERE.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**SEAN STERLE** /S/ |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>/S/   **ALEXANDER F. MacKINNON** | DATE<br>June 20, 2017 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Jeff Mitchell x0698     REC: Detention

JM

**AFFIDAVIT**

I, Sean Sterle, being duly sworn, hereby state as follows:

## I.   INTRODUCTION

1.    I am a Special Agent ("SA") of the Federal Bureau of
Investigation ("FBI") and have been so employed for
approximately nineteen years.  I am assigned to the Violent
Crimes squad where I have been responsible for investigating
violent crimes, including bank robberies and commercial
institution robberies as well as murder for hire, cold case
homicides, extortion, interstate threats, and kidnappings within
the FBI Los Angeles Division territory.  In 1998, I completed
four months of training at the FBI Academy at Quantico,
Virginia, where I received formal training in criminal
investigative techniques.  In 2002, I received training from an
FBI course in Advanced Investigative Techniques which focused on
the use of sophisticated techniques such as pen registers, wire
interceptions, and undercover operations when investigating
violent criminal enterprises.

2.    During the course of my employment with the FBI, I
have conducted, or been involved in investigations which
employed, various investigative techniques including court-
authorized interception of wire and oral communications, pen
registers/trap and trace devices, telephone toll analysis,
physical surveillance, confidential sources, cooperating
witnesses, undercover operations, search warrants, grand jury
proceedings, and financial investigations.  Through my training,
experience and interaction with other law enforcement officers,

I am familiar with the methods employed by suspects during
extortions.

## II. PURPOSE OF AFFIDAVIT

3.    I make this affidavit in support of a criminal
complaint and arrest warrant for Michael Potere ("Potere") for a
violation of Title 18, United States Code, Section 1951(a)
(extortion).

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.   This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all of my knowledge of or investigation
into this matter.   Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

## III. SUMMARY OF PROBABLE CAUSE

5.    The FBI is currently investigating the extortion of an
international law firm (referred to herein as "ILF") by Michael
Potere ("Potere").   As set forth below, Potere worked as a
junior associate attorney at ILF in their Los Angeles office
from 2015 through June 1, 2017.   In March 2017, Potere told ILF
that he intended to leave the firm to pursue a graduate degree
in Political Science, but requested to continue working at ILF
until his graduate program began in the Fall of 2017.   On March
28, 2017, ILF declined Potere's request to continue working and

informed Potere that his last day at ILF would be June 1, 2017.
In April 2017, after Potere learned that ILF declined his
request to continue working, Potere accessed the email account
of a partner at ILF, searched for, and downloaded confidential
and sensitive documents from the partner's email account.  On
May 17, 2017, Potere spoke to ILF partners and demanded $210,000
and a piece of artwork, among other items, from ILF in exchange
for the return of the confidential and sensitive documents.
Potere has repeatedly stated that if ILF does not meet his
demands he intends to email the confidential and sensitive
documents to Abovethelaw.com, a legal blog website, to cause
financial harm to ILF.  Multiple telephone calls and in-person
meetings have occurred in which Potere has made his demands
known and the consequences that will occur if his demands are
not met.

IV. <u>STATEMENT OF PROBABLE CAUSE</u>

6.   On or about May 19, 2017, the FBI was contacted and
informed that an associate attorney had obtained confidential
and sensitive documents from ILF and was threatening to send the
documents to Abovethelaw.com unless ILF paid him $210,000.

A.   Interview of Partner A

7.   On May 22, 2017, SA Joseph Hamer and I went to the Los
Angeles office of ILF and interviewed an ILF partner ("Partner
A").

8.   Partner A provided the following information during
the interview:

a. Partner A is a partner at ILF and has worked for ILF or one of its predecessors since 2008. Partner A was assigned as Potere's "Practice Advisor," which was like a mentorship program within the firm. As part of the responsibilities of being a Practice Advisor, Partner A was responsible for talking to Potere about his progress reviews.

b. Partner A stated that in March 2017, Potere told Partner A that Potere had been accepted into a graduate program at a local university and would be starting in the Fall of 2017. Potere requested to continue working at ILF until graduate school started; however, on March 28, 2017, ILF informed Potere that it would not allow Potere to continue working at ILF through the summer and that his last day at ILF would be on June 1, 2017.

c. On May 15, 2017, Potere requested a meeting with his two Practice Advisors, Partner A and "Partner B," and they agreed to meet the following day. On May 16, 2017, Potere arrived at the meeting with two bottles of wine and three manilla folders, each folder was approximately one inch thick. After Potere thanked Partners A and B for their mentorship, Potere told Partners A and B that the reason he wanted to meet with them was because ILF "Partner C" (described in detail below) had given Potere access to Partner C's emails while Potere was working on a particular matter with Partner C. Potere stated that he looked through Partner C's emails and found an email dated May 20, 2016, written by Partner C, that upset Potere. In the May 20, 2016 email, Partner C emailed

Potere's mentors and was critical of Potere for taking a
vacation during the middle of an important briefing schedule for
a case.  Potere told Partners A and B that it upset him when he
read the email.  Potere alleged that Partner C's email defamed
his character.  Potere stated that after he read the May 20,
2016 email, he searched for additional emails in Partner C's
account.  Potere indicated that he downloaded and printed out
the emails.  Potere also claimed that he found evidence of a
possible class action suit against ILF, although he would not be
a member of the class and he later acknowledged that he did not
have clients for the class action suit.  Potere refused to
provide a copy of the documents because he wanted a
confidentiality agreement.

       d.    On May 17, 2017, Partner A and "Partner D"
(described below), had a conference call with Potere.
Throughout the conversation, Potere refused to "confirm or deny"
that he had any ILF documents, but during the conversation,
Potere demanded $210,000 and a piece of artwork that was near
Partner C's office.  Potere also referred to the website
Abovethelaw.com, and threatened to release the confidential and
sensitive documents to the website.

    **B.**    **Interview of Partner C**

    9.    On May 23, 2017, SA Hamer and I returned to ILF's Los
Angeles office and interviewed ILF Partner C.

    10.    During the interview, Partner C stated that he is the
Senior Partner and Managing Director of ILF's Los Angeles
Office.  Partner C first met Potere when Potere interviewed with

ILF.  Potere's office was two doors down from Partner C's office
and they worked on two matters together.  In one case, Potere
was the junior associate and Partner C was the lead partner.  In
the fall of 2015, the senior associate assigned to this case
left ILF to work for another firm.  When the senior associate
left, Partner C assigned Potere to gather discovery to produce
to the opposing party in the case; however, some of the
documents were in Partner C's emails.  To ensure Potere had all
the necessary documents, Partner C asked his assistant to
arrange for Potere to obtain access to Partner C's email
account.  Partner C believed that there might have been one to
two dozen emails that Potere needed for the assignment.  This
case ended in summer of 2016.

    C.    **Interview of Partner B**

    11.  On May 23, 2017, SA Hamer and I interviewed Partner B
via telephone.  Partner B is currently a partner in ILF's Los
Angeles office.  Partner B provided the following information
during the interview:

        a.  Partner B met Potere in 2015 when Potere was
initially hired as an associate at ILF.  Partner B was assigned
as Potere's "Practice Group Advisor," or mentor.  Partner B
advised that in late 2015 or early 2016, Partner A became
Potere's mentor.

        b.  Partner B stated that he was present for the May
16, 2017, meeting with Potere and Partner A when Potere stated
that he was given access to Partner C's email account.  Partner
B stated that he advised Potere that if Partner C had given him

access to his email account for a case, then the access was
authorized only for that time.  Partner B advised Potere that
any additional access to Partner C's email account was not
authorized.  Partner B stated that Potere did not reply to this
advice, but just looked at Partner B.

    **D.**    **Interview of Partner D**

    12.  On May 24, 2017, SA Hamer and SA Cody Burke went to
the ILF Los Angeles office and interviewed ILF Partner D.
Partner D works in the New York office but was in Los Angeles at
this time.  Partner D provided the following information during
the interview:

    a.  Partner D has worked for ILF or one of its
predecessors since 2000.  Partner D has been the firm's General
Counsel for the past two years and was the Deputy General
Counsel for nine years prior to that.  Partner D advised that as
the firm's General Counsel, employees will call him when there
are issues with firm personnel and clients.

    b.  On May 18, 2017, Partner D participated in a
conference call with "Partner E" (another ILF partner) and
Potere.  Partner D told Potere that there was no benefit for
Potere to keep the confidential ILF documents obtained from
Partner C's email account.  Partner D advised Potere to file his
lawsuits and then he would be able to receive the necessary
documents during the discovery process.  Partner D explained to
Potere that there were criminal consequences and ethical issues
and it went against firm policy for Potere to keep the
documents.  Potere declined to return the documents and stated

that the value was in the documents.  Potere also said he did
not care about professional disciplinary issues or about the bar
because he did not plan to practice law again.

      E.    **Consensually Recorded Meeting**

    13.  On May 25, 2017, at approximately 4:00 p.m., a
prearranged meeting between Partners D and E and Potere took
place in a conference room at ILF's Los Angeles office, and was
consensually recorded with audio and video.

        a.    Prior to the meeting, SA Burke, SA Hamer, and I
briefed Partners D and E, and ILF's Security Advisor.  Partner D
was provided with a digital audio/video recording device, and
Partner E was provided with a digital audio recording device.

        b.    At approximately 3:57 p.m., SA Burke observed
Potere enter the lobby of the building and walk to the elevators
while carrying a satchel bag.  At approximately 3:58 p.m., SA
Hamer activated the recording devices.  At approximately 4:01
p.m., Potere arrived at ILF.  Partner D greeted Potere and
escorted Potere to the conference room where Partner E was
seated.  At approximately 5:13 p.m., Partner E exited the
conference room and requested a flash drive.  While outside the
conference room, Partner E informed SA Burke and I that Potere
agreed to download the ILF documents from his laptop computer to
a flash drive.  Partner E returned to the conference room and an
ILF employee delivered a flash drive.  At approximately 6:00
p.m., Partner D escorted Potere out of the conference room to
the elevators.  Potere departed ILF via elevator.  At
approximately 6:02 p.m., SA Hamer deactivated and collected the

audio/video recording devices.   Partners D and E were debriefed by the agents, and SA Hamer collected the flash drive from Partner D.

      c.   I have reviewed the audio/video recording from the May 25, 2017 meeting.  The statements made by Potere on the recording confirmed what had been reported to the FBI during the interviews of ILF employees.  In summary, I learned the following from watching the recording: (1) Potere received access to Partner C's email account when they worked together on a case; (2) in April 2017, Potere searched Partner C's emails and found an email about Potere that he perceived as defamatory; (3) after reading that email, Potere searched for confidential firm documents and other emails in Partner C's account and downloaded them; (4) Potere drafted complaints for a defamation lawsuit regarding the statement made about him and a class action suit on behalf of other attorneys at the firm; Potere acknowledged that he would not be a member of the class action because it did not apply to him and that he did not have any clients for the class action; (5) Potere demanded $210,000 and a specific piece of artwork from ILF's Los Angeles office, among other items; (6) if Potere's demands were not met, he planned to send the confidential and sensitive documents to "Above The Law"; (7) Potere claimed to have an email set to release the confidential and sensitive documents on an auto-timer and has provided a sealed packet containing the documents to a friend; and (8) Potere understood that publicly releasing the documents

would cause substantial harm to ILF.   Illustrative excerpts from
the recording include the following:

        i.    Partner D said he would like a better
understanding of what documents Potere had in his possession.
Partner D said the firm is being asked to pay money and Partner
D needs to know what he is paying for so he can advise the
firm's management.   Potere replied, "everything goes away, and
everything I have, whatever I have, is destroyed" and that the
lawsuits or publicity would not happen.

        ii.  Potere said that if he does not get the
settlement terms, then he has nothing to lose.   Potere said that
if the firm further insults him by denying him the money, then
the only question for Potere is "just how much damage can I do."

        iii. Potere said that he felt like people his age
were getting "screwed" and that hypothetically he might have a
chance to "screw back."   Potere said that if he does not receive
the money then he is going to double down on the negative.
Partner D asked what he meant by negative.   Potere said that if
he had documents and released them publicly, the firm might try
to press criminal charges against Potere.   Potere said that
people who rape other people do not get jail time so he is not
worried about jail time for his actions against ILF.   Potere
said that he does not intend to continue practicing law so he is
not worried about bar sanctions.   Potere acknowledged that his
graduate school may revoke his acceptance, but that he was
prepared for that possibility.   Potere described that situation
as his worst-case scenario, but said it would be worth it.

iv.   Potere used the word "hypothetically"
throughout the conversation when discussing the documents.
Potere asked for confidentiality so that Partners D and E could
not go to the police.

v.   Partner D asked Potere who he has told about
the documents.  Potere replied, "Look, to be perfectly honest,
if people know, my s**t isn't worth anything."

vi.   Partner D stated that he wanted to give
Potere the opportunity to return the ILF documents without it
being part of a threat to release them publicly.  Partner D said
they could then talk about settling the defamation claim.
Potere said he did not feel comfortable giving up his leverage
for being physically safe.  Partner D asked if the leverage was
for being safe or for "screwing the firm."  Potere said that if
they do not settle then the leverage changes from safety to "at
least [Partner C] will be embarrassed."

vii. Potere looked through the ILF documents on
his laptop and stated he had "146 emails and memos."  Potere
described how he searched through Partner C's emails -- first,
by searching his own name.  Potere said he "got the best
results" by searching for "Confidential" and "Compensation" and
then saved those emails and attachments.  Potere described to
Partner D that when he "saved" these emails and attachments, it
meant Potere transferred them to his laptop and they were backed
up "by Dropbox in the Cloud."

viii.   Partner D told Potere that he
understood that if someone thought they had a claim, they would

file a lawsuit.  Partner D then described how this situation was
different: "This is, if you don't pay me, I'm gonna file a claim
- but I'm also gonna damage you guys (ILF) in the marketplace by
releasing highly sensitive documents.  Right?"  Potere
responded, "It's a way to look at it."  Potere went on to say
that if he was "fairly paid, everything goes away.  If I'm
screwed over again, well then, why. . . why should I protect
people who went out of their way to hurt me?"

        ix.  Potere told Partner D, "Someone your age
wouldn't do this, because there's like -- something to lose.  I
have nothing to lose, it's already been taken.  It's already
gone.  So, and that's just like what's happening to me and my
friends professionally all the time.  And everyone gets away
with it all the time.  And . . . I won't let [Partner C] get
away with it this time.  So. . ."  Partner E interrupted and
said, "I understand you're angry with [Partner C], but why do
you want to hurt the rest of us?"  Potere replied, "Well, I also
don't like [Partner F -- ILF's U.S. managing partner] at all."
Potere continued, "Yeah, but if the firm falls apart it'll be
just like Dewey (believed to be referring to a now dissolved New
York law firm that went bankrupt in 2012) -- people will just
get other jobs.  But hopefully [Partner C] will have a little
trouble managing an office again."  Potere added that he did not
want to release the confidential information that would hurt
ILF.  Partner D asked, "But you will if we don't pay you?  Is
that the bottom line."  Potere replied, "Yeah."

x. Partner D reiterated that Potere had wrongfully obtained ILF's confidential and sensitive documents that contained the firm's financial information which Potere should not have taken. Potere responded, "I agree with that. I shouldn't have had access to [Partner C's] emails." Partner D told Potere that even with access to Partner C's emails, Potere should not have taken the information and transferred it to his personal laptop. Potere said, "...you're right, objectively, you're right. And I believe my reasons justify it."

xi. Potere installed software on his computer that would auto-send the ILF documents to Abovethelaw.com from his Gmail account by a certain date if his demands were not met.

xii. Potere eventually agreed to provide a copy of the documents he obtained from Partner C's email account. Partner E obtained a USB flash drive and provided it to Potere. Potere copied the ILF documents from his personal laptop computer to the USB flash drive. Potere then provided the flash drive to Partners D and E as proof that he had information that could cause potential harm to ILF. After the meeting, Partners D and E provided the flash drive to SA Hamer.

## F. Documents Contained on Flash Drive

14. On June 6, 2017, SA Hamer and I reviewed a copy of the flash drive that was booked into FBI evidence. The flash drive contained a single folder titled "00ATL." During the May 25, 2017 meeting, Potere said that "ATL" is short for "Above The Law." Within the "00ATL" folder were four additional folders titled: "01 [Partner C] Emails"; "02 Michael Potere Emails";

"03 Defamation Complaint and Exhibits"; and "04 [Class Action]
Complaint and Exhibits."

15.   The folder labeled, "03 Defamation Complaint and
Exhibits" contained two subfolders: "01 Unredacted" and "02
Redacted to File (incl forms)."  The documents in these folders
included a draft Complaint dated May 16, 2017, alleging
defamation, an unsigned declaration by Potere also dated May 16,
2017, and eight exhibits labeled A-H, including the May 20,
2016, email in which Partner C was critical of Potere.

16.   The folder labeled, "04 [Class Action] Complaint and
Exhibits" contained two subfolders: "01 Unredacted" and "02
Redacted to File (incl forms)."  These folders contained a draft
Complaint, an unsigned declaration by Potere, and two exhibits.
The first exhibit included a screen shot of Potere's email
account which included access to Partner C's inbox.  Exhibit B
contained an email exchange about retaining an attorney who had
been working at ILF on a part-time basis.  The email does not
appear related to any potential member of the class Potere
alleges was harmed and appears to be an attempt to embarrass
ILF.

17.   The remaining documents on the flash drive were
contained in the folders titled "01 [Partner C] Emails" and "02
Michael Potere Emails."  A significant portion of documents
appear unrelated to both of Potere'e alleged claims.  The
remaining documents contain the following information:

a.   ILF quarterly financial reports;

b.   Documents describing how ILF determines its billing rates for clients and specific factors relied on to arrive at those rates;

c.   A list of clients and the dollar amounts charged to those clients.  The list indicates which clients have outstanding balances to ILF;

d.   Documents describing how ILF partners should approach clients who have outstanding and overdue balances;

e.   Documents describing issues to be discussed at meetings for ILF partners;

f.   Documents describing voting for "Full Interest Partner Candidates";

g.   Confidential reviews of associate attorneys; and

h.   Detailed analysis describing recruitment of lateral attorneys, and offers to those attorneys.

G.   **June 8, 2017 Consensual Call**

18.   On June 8, 2017, Partners D and E called Potere, which was recorded by SA Hamer.  During the call, Partner D told Potere that ILF has agreed to meet his demands and pay Potere for the return of the ILF documents.  Partner D and Potere agreed to meet on June 19, 2017 to exchange the documents for the money.  Partner D asked for assurances that Potere would return all of the documents.  Potere agreed to let someone from ILF's IT department review his laptop computer, Dropbox account, and Gmail account to ensure that all copies of the documents have been deleted.  Potere also agreed to bring the sealed

envelope to the June 19, 2017, meeting which contained a hard copy of the documents.   Potere said that he took a lot of precautions, and his computer is encrypted and is protected by a fingerprint password.

19.   On June 16, 2017, Partner E informed the FBI that she communicated with Potere earlier that day via email and they agreed to continue the meeting to June 22, 2017.

### V.   CONCLUSION

20.   For all the reasons described above, there is probable cause to believe that Potere has violated Title 18, United States Code, Section 1951(a).

/s/
_____
SEAN STERLE, Special Agent
Federal Bureau of
Investigation

Subscribed to and sworn before me
this 20th day of June, 2017.

/s/   ALEXANDER F. MacKINNON
_____
HONORABLE ALEXANDER F. MACKINNON
UNITED STATES MAGISTRATE JUDGE